BUCKLEY, Appellant, vs. BROOKS, Respondent.

*January 10—February 5, 1935.*

For the appellant there was a brief by *Rogers & Owens* of Portage and *Martineau & Martineau* of Marinette, and oral argument by *Harlan B. Rogers*.

For the respondent there was a brief by *Adolph P. Lehner* and *Lehner & Lehner,* all of Oconto Falls, and oral argument by *V. J. O'Kelliher* of Oconto, and *Philip Lehner*.

MARTIN, J. The jury found that defendant did not make a full and fair statement to his attorney, J. A. Krueger, of all the material facts within his knowledge relating to the entire transaction. The trial court changed the answer, holding that defendant did make a full, fair, and complete statement of the entire case to his attorney. This presents the plaintiff's first assignment of error. Our main inquiry then is, What are the facts and what statement of them did the defendant make to his attorney? As to many of the facts, there is no conflict in the evidence. As to what took place in the defendant's store at Pound in Marinette county when the trouble occurred, there is, as to some incidents, a very sharp conflict in the testimony of the several witnesses who testified at the trial.

It appears that plaintiff is a trucking contractor and a resident of the village of Rio, Columbia county, Wisconsin. That in the fall of 1932 he was employed on a highway job working near Beaver in Marinette county on which work he employed Arnold and Llyial Hagen, Russell Buskager, and Fred Jennings, as truck drivers. On or about September 2, 1932, he rented from the defendant a house located in the town of Beaver for the accommodation of himself and family for a period of two months, and paid defendant therefor,

in advance, the sum of $100. As a guaranty that the house would be left in good condition at the expiration of his tenancy, he gave defendant two promissory notes amounting to $75. His truck drivers lived with him while they were engaged on the job in Marinette county.

The defendant lives in the village of Pound where he operates a general store. He is also president of the Farmers State Bank of Pound. Plaintiff did his banking business at said bank, and, while on this highway job, he deposited between $7,000 and $8,000 in said bank. He had no difficulty of any kind with the bank until about the time he had finished his contract, when the bank refused payment on one of his checks in the sum of $3, at which time plaintiff learned that the bank had charged the two notes amounting to $75 against his checking account which closed the account and occasioned the bank to refuse payment on the $3 check. This occurred on Monday, October 31st. Plaintiff admits this incident made him a "bit mad."

On October 31st plaintiff notified defendant that he was ready to vacate the house and requested the defendant to inspect it to ascertain if any damage had been done other than ordinary wear, and in order that they might have a settlement as to the $75 which plaintiff had deposited with the bank as a guaranty. It appears defendant promised he would go that evening and inspect the house; that he did not do so and on the following morning plaintiff again called the defendant, whereupon defendant told plaintiff to get everything out of the house and loaded, that he would be out to look at it. Defendant failed to do so.

On the morning of November 1st plaintiff loaded his household furniture and other belongings on his trucks preliminary to leaving for his home in Rio. The defendant not having arrived to inspect the house, at about 9:30 in the morning, plaintiff drove to Pound to see what was delaying the defendant. Plaintiff was accompanied by his truck driv-

ers. When he arrived at the defendant's store in Pound, defendant was standing behind the counter waiting on a customer. Plaintiff asked defendant whether he was coming to inspect the house, and the defendant replied that he could not go just then because he had only one clerk in the store. Plaintiff said that his goods were loaded; that his wife and children were out in the cold; that they had two hundred miles to drive and wanted to get started. He requested defendant to come at once.

When defendant refused to go and inspect the house, plaintiff then asked him when he would. There is testimony that defendant replied that he would come when he got "damned good and ready." The plaintiff's truck drivers were then in the defendant's store. Russell Buskager then asked defendant if he could not get away and inspect the house so they could leave for Rio. Plaintiff then demanded that defendant tell him when he would go and inspect the house. Again defendant replied that he would go when he got "damned good and ready." The testimony shows that Mr. Jennings, one of the truck drivers, said to defendant, "Come on; be a white man; come on up and look at the house." Testimony on the part of the plaintiff shows that defendant was then angry and pushed Jennings with his hand saying, "Get out of here you ——;" that defendant grabbed Jennings by the coat and raised his arm to strike; that Jennings then struck defendant a blow on the cheek driving him back and causing him to fall against the counter and strike his head. Defendant then grabbed a battery or generator and threw it at Jennings, whereupon Jennings sprang behind the counter and struck defendant several times with his fist about the head and face, knocking him down behind the counter.

When defendant got up, he threw a bottle of oil which struck Buskager. He also threw a generator which missed the plaintiff and went through a wall case of tools scattering them all over the floor. Defendant then ran to his desk,

picked up a loaded gun, and pointed it at Jennings' face. When defendant produced the gun plaintiff picked up a fire extinguisher from the floor or the counter. Thereupon Jennings, the plaintiff, Buskager, and the two Hagen boys left the store.

One of the defendant's witnesses, Richard Oshefsky, testified that he saw the plaintiff pick up the fire extinguisher and throw it at Mr. Brooks. The plaintiff testified that during the time they were in the store he made no threats nor did he do anything to Mr. Brooks; that he did not strike him, throw anything at him, or chase him. He testified that he did pick up the fire extinguisher when Brooks came out with the gun, and that he laid it back on the counter after Jennings started out of the store. Margaret Hartwig, a defense witness, testified that Mr. Buckley had a fire extinguisher in his hand; that he took a few steps, then came back and laid it at the end of the table as he went out. Other defense witnesses testified to the effect that Mr. Buckley had a fire extinguisher in his hand, but did not testify that he struck Brooks with it or that he had thrown it at Mr. Brooks. Lillian Tutas, a defense witness, and one of the clerks employed in defendant's store, testified that she was working in the store when the trouble occurred; that at about 9:30 Mr. Buckley and the other men came into the store; that they requested Mr. Brooks to go to inspect the house; that Brooks pushed Jennings and Jennings hit him with his fist.

Laura Culver, a sister of the defendant, and the bookkeeper at the Farmers State Bank, testified that on the afternoon of November 1st Mr. Buckley was in the bank and stated that he had heard what "God-damn crooks Rabe and Brooks" were, and that he would "get the dirty ———." This is denied by Mr. Buckley.

The plaintiff's testimony as to what took place in defendant's store, and his part in what was said and done, is corroborated by the testimony of the four truck drivers.

We have detailed the foregoing facts, as disclosed by the testimony, possibly at greater length than may be necessary, but as a basis for the next inquiry which is, Did the defendant fully and fairly state to his attorney all the material facts within his knowledge relating to the entire transaction? The defendant upon his direct examination testified:

"I showed Mr. Krueger the bruises and I told him about these men. I told him these men had a contract with us. They came up and wanted me to go up and look at the house. I explained I told them I couldn't go right away, but they were not satisfied. They became insulting and they insisted that I go immediately. I told him about this Mr. Jennings trying to get behind the counter and I pushed him back and he slugged me. Almost instantly he knocked me back against the shelving and I received a blow on my head. I also told him I saw Mr. Buckley across the counter with the fire extinguisher raised, and I threw this bottle at him, and almost immediately I was struck back of the ear and ran back in the office and got the gun and stopped them with the gun.

"*Q.* During the time they were there running towards the safe, or just before, were there other things being thrown at you? *A.* Yes, sir.

"*Q.* How many? *A.* The air was full of stuff. I couldn't duck it."

And upon his cross-examination he testified:

"I told him this man Jennings slugged me, came in through this opening, and I pushed him back and ordered him out of the place. I told him that several times. I pushed him back again and he slugged me. Then the missiles started flying. I do not know who hit me. I saw Buckley standing across the showcase with a fire extinguisher in his hand. I ran around the counter and ran into the office with these fellows chasing me, and stopped them with a gun, and that Jennings was right in the office behind me.

"*Q.* Is that substantially all you told Mr. Krueger? *A.* I think that covers about it."

The testimony of Attorney Krueger, who was called as a witness by the defense to testify as to what the defendant

had told him, in general corroborates the foregoing testimony as given by the defendant on his direct and cross-examination.

On the statement of facts as given by Mr. Brooks to his attorney, the attorney advised the making of the complaint and the issuing of the warrant charging the plaintiff of an assault upon said defendant with intent to do him great bodily harm, resulting in the plaintiff's arrest and detention which is the basis for this action. In this action for malicious prosecution advice of counsel is not a legal defense unless there be a full, fair, and honest statement to such counsel of all the facts and information within defendant's knowledge. *Smith v. Federal Rubber Co.* 170 Wis. 497, 500, 175 N. W. 808.

After careful examination of all the testimony, we hold that the inquiry, as presented by the first question of the special verdict, was a jury issue, and that the trial court erred in changing the answer to the first question of the special verdict from "No" to "Yes." *Trautmann v. Charles Schefft & Sons Co.* 201 Wis. 113, 115, 228 N. W. 741. In determining whether or not the trial court erred in setting aside the jury's answer "No" to the first question, and substituting therefor the answer "Yes," this court must take that view of the evidence which is most favorable to the plaintiff's contention. *Mueller v. O'Leary,* 216 Wis. 585, 257 N. W. 161.

To the fourth question of the special verdict as to damages the jury answered "None." There is clear proof of actual compensatory damages. Plaintiff was held in jail at Marinette from November 8th to November 17th, inclusive. He was deprived of his right to vote on election day. Mention of his arrest and prosecution appeared in newspapers published in Portage, Milwaukee, and in Marinette. He incurred expense for the services of his attorneys. There is proof of other items of actual compensatory damages, but it is not for

this court to say at what sum plaintiff's damages should be assessed. In view of the conclusion reached, there must be a new trial of this action on the question of damages only.

*By the Court.*—The judgment of the circuit court is reversed, and the cause remanded with directions to reinstate the jury's answer "No" to the first question of the special verdict and for a new trial on the question of damages only.